UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS, and all similarly situated organizations; and MARY DIXON, and all similarly situated persons | ) ) ) ) ) ) | |
| Plaintiff, | ) | Case No. 09 C 7706 |
| v. | ) ) | Judge Joan B. Gottschall |
| JESSE WHITE, Illinois Secretary of State, in his official capacity, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiffs, the American Civil Liberties Union of Illinois and Mary Dixon (collectively the "ACLU"), move for a temporary restraining order and preliminary injunction under Federal Rule of Civil Procedure 65(a) & (b), enjoining the enforcement of the Illinois Lobbyist Registration Act, 25 Ill. Comp. Stat. 170, Public Act 96-555 at § 65 (the "Amended Act"). The ACLU filed a class action complaint under 42 U.S.C. § 1983 alleging that portions of the Amended Act violate the First and Fourteenth Amendments to the United States Constitution by imposing, *inter alia*, a $1000 levy on protected speech in excess of the costs to administer the lobbying regulations in the Amended Act and providing an exemption for religious organizations and the news media.

> **1.** **The Tax Injunction Act Does Not Divest This Court Of Jurisdiction Over This Case.**

At the outset, the Secretary contends that the Tax Injunction Act (the "TIA"), 28 U.S.C. § 1341, divests the court of subject matter jurisdiction over this action because

1

suits challenging the lawfulness of state-imposed taxes must be brought in state court,

and the Complaint alleges that the Amended Act assesses an unlawful tax on speech.

The Tax Injunction Act provides:

> The district courts shall not enjoin, suspend or restrain the
> assessment, levy or collection of any tax under State law
> where a plain, speedy and efficient remedy may be had in
> the courts of such State.

28 U.S.C. § 1341. Whether the TIA divests this court of jurisdiction turns on whether the

levy is a "tax" or a "fee," a distinction based on federal law which the court draws by

looking past labels and considering where the levied money goes (*i.e.*, to what state

account) and "*why* the money is taken." *Hager v. City of W. Peoria*, 84 F.3d 865, 870-71

(7th Cir. 1996) (emphasis in original). Where a levy confers a general benefit to the

public it is considered a tax; a fee, by contrast, "provides more narrow benefits to

regulated companies or defrays [an] agency's cost of regulation." *Id*. at 870. "The

classic 'regulatory fee' is imposed by an agency upon those subject to its regulation."

*San Juan Cellular Tel. Co. v. Public Service Comm'n*, 967 F.2d 683, 685 (1st Cir. 1992).

The Amended Act imposes new regulations on registered lobbyists and lobbying

organizations such as annual completion of an ethics training course and the filing of

weekly reports documenting lobbying expenditures with the Secretary while the General

Assembly is in session. The Amended Act additionally requires the Secretary to

investigate all alleged violations of the Amended Act and allocates $800 of the $1000

levy ( the "Levy") to the Lobbyist Registration Administration Fund (the "LRAF") to be

used to administer and enforce the Amended Act; the $200 balance is designated for the

Illinois' General Revenue Fund (the "GRF"). *See* 25 Ill. Comp. Stat. 170/5 (West 2009).

The Secretary urges that the TIA applies because the Complaint alleges that the $200 portion of the Levy earmarked for the GRF is an "unlawful tax on speech." Resp. 5 (citing Compl. ¶5(a)). As set out above, neither the legislature's nor the ACLU's labeling of the Levy is entitled to any deference in the TIA analysis. *Katherein v. City of Evanston*, No. 08 C 83, 2009 WL 3055364, at *3 (N.D. Ill. Sept. 18, 2009) (whether a levy is a tax or fee under the TIA is established "without regard to the label affixed to it"); *Lavis v. Bayless*, 233 F. Supp. 2d 1217, 1220 (D. Ariz. 2001) ("The characterization of a particular assessment as a 'fee' or a 'tax' by the imposing body has no dispositive or talismanic significance"). As for the allocation of the Levy's revenues to the GRF, the Seventh Circuit has explicitly held that the dedication of *all* the revenue generated by an assessment to a general fund cannot alone support a determination that an assessment is a tax subject to the TIA. *See Hager*, 84 F.3d. at 870-71. Here, only 20% is designated for the GRF. Moreover, even were the distribution of the Levy's revenues dispositive of its status under the TIA, the Levy's designation of eighty percent of revenues to the LRAF for use in administering the Amended Act is consistent with the structure of a fee. *See San Juan*, 967 F.2d at 685. The Levy is analogous to the "classic 'regulatory fee'. . . imposed by an agency upon those subject to its regulation" because, like an agency, the legislature here is regulating those with whom it has interactions concerning the manner of those interactions. *Id*.

*National Right To Life Political Action Committee State Fund v. Devine*, No. 96-359, 1997 WL 525139, at *1 (D. Me. Aug 8, 1997) does not counsel a different result. The *Devine* plaintiffs challenged a lobbying assessment imposed by ballot initiative that allocated fifty percent of the assessment's revenues to Maine's general fund. *Id.* at 2.

Indeed, the proportion of total revenues allocated for purposes other than regulating the lobbyists who paid the fee was greater than half because the remaining revenues were funneled to a commission which used them for purposes other than regulating Maine's lobbyists. *Id.* Such a bill is plainly distinguishable from the provisions in the Amended Act. *See, e.g.*, *Gasparo v. City of N.Y.*, 16 F. Supp. 2d 198, 219 (E.D.N.Y. 1998) ("[W]here the predominant purposes of a legislative scheme are regulatory, the mere fact that the scheme also raises revenue does not transform the scheme into a tax.") Furthermore, Illinois House Speaker Madigan's remarks to legislators regarding the bill, which amended the Lobbyist Registration Act, noted that the Levy was being imposed to pay for additional enforcement of the provisions in the Amended Act. Trans. of Ill. House of Reps. Floor Debate (Resp. Ex. B at 2) (the Amended Act "requires disclosure of all expenditures by lobbyists [and] increase[s] the registration fee to pay for the additional inspections"). These remarks demonstrate that Speaker Madigan's understanding of "*why* the money is taken" (*Hager*, 84 F.3d at 71) is consistent with the Amended Act's designation of 80% of the Levy's revenues to the costs of regulating lobbyists.

Finally, in numerous cases, the Seventh Circuit and other courts in this district have discussed the fit between fees and the costs of regulation, without addressing any TIA bar. *See Joelner v. Village of Washington Park*, 378 F.3d 613, 626 (7th Cir. 2004) (affirming in part district court's partial grant of a TRO where plaintiff challenged the constitutionality of a $10,000 fee imposed on adult bookstores and a $30,000 fee levied on adult cabarets); *S. Suburban Housing Ctr. v. Greater S. Suburban Bd. Of Realtors*, 935 F.2d 868, 897-98 (7th Cir. 1991) (finding $60 fee to display "for sale" sign violated

First Amendment because municipal defendant failed affirmatively to establish the rational relationship between the fee and its administrative costs); *Covenant Media of Illinois, L.L.C. v. City of Des Plaines*, No. 04 C 8130, 2005 WL 2277313, at *5 (N.D. Ill. Sept. 15, 2005) (entering preliminary injunction proscribing enforcement of $15,000 licensing fee applicable to each commercial sign where the City of Des Plaines put forth no evidence of the reasonable relationship between the fee and the costs of administering the city's sign ordinance). While none of these suits discussed the TIA's applicability to the fee under challenge, the Supreme Court recently relied on a similar silence as support for its holding that the TIA did not apply to third-party constitutional challenges to tax exemptions. *See Hibbs v. Winn*, 542 U.S. 88, 110-12 (2004) ("In a procession of cases not rationally distinguishable from this one, no Justice or member of the bar of this Court ever raised a [TIA] objection that, according to the petitioner in this case, should have caused us to order dismissal of the action for want of jurisdiction. . . Consistent with the decades-long understanding prevailing on this issue, respondents' suit may proceed without any TIA impediment"). While the parties' failure to raise a TIA challenge makes these cases less powerful as precedent than they would otherwise be, they make clear that federal courts frequently adjudicate such suits and see no obstacle to doing so.

The court therefore concludes that it has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 1331 and 1343 because the Levy is a "fee" and the Tax Injunction Act does not apply. The Secretary's contention that the court can determine that the Levy is a fee only by finding that the magnitude of the Levy is "reasonable" under the First Amendment is incorrect. In *Hager*, the Seventh Circuit emphasized that the determination of whether a levy is a fee or a tax should focus, *inter alia*, on *why* the

legislature sought to impose a levy. *See Hager*, 84 F.3d. at 871. Prior precedent focuses

the inquiry on whether a levy is "calculated" to generate general revenues or defray costs

imposed by the group that pays the levy. *Giginet v. Western Union ATS, Inc.*, 958 F.3d

1388, 1399 (7th Cir. 1992). Here, the Secretary takes the position that the Levy is a "fee

that is rationally related to the costs of administering" the Amended Act, an argument

consistent with the distribution of Levy revenue prescribed by the Amended Act. Resp.

5. The fact that the legislature intended the Levy to support the Amended Act's

administrative costs, however, does not satisfy the Secretary's burden affirmatively to

establish the fit between the Levy and the cost of administering the Amended Act which

the First Amendment requires. *See S. Suburban Housing Ctr. v. Greater S. Suburban Bd.

of Realtors*, 935 F.2d 868, 897-98 (7th Cir. 1991). And the court rejects the Secretary's

position that allegations or evidence that revenues from the Levy exceed the costs of

administering the Amended Act render the Levy a tax. Violating the Constitution by

imposing excessive fees on constitutionally protected activity goes to the plaintiffs'

likelihood of success on the merits. It does not render a regulatory fee a tax.

**2. <u>Plaintiff's Are Entitled To A Temporary Restraining Order.</u>**

To prevail on its motion for a TRO, the ACLU must show that (1) it has a

reasonable likelihood of success on the merits of the underlying claims; (2) it has no

adequate remedy at law; (3) it will suffer irreparable harm if the injunctive relief is

denied; (4) the irreparable harm it will suffer without the injunction is greater than the

harm that the defendants will suffer if the injunction is granted. *See River of Life

Kingdom Ministries v. Vill. of Hazel Crest*, 585 F.3d 364, 369 (7th Cir. 2009). The court

must also consider whether the public interest "will be harmed sufficiently that the

injunction should be denied." *Id*. (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).

A.      **Reasonable Likelihood of Success On The Merits**.

While the ACLU must show that it has a reasonable likelihood of success on the merits, it is the Secretary's burden affirmatively to "establish the reasonable fit" between the Levy and the costs of administering the activities covered by the Amended Act. *S. Suburban*, 935 F.2d at 898. To date, the Secretary has offered only conjuncture in support of his position that the Levy is reasonably related to the costs of administering the Amended Act. By contrast, the ACLU has proffered figures derived from public records showing that the LRF has run an approximately $100,000 surplus for the last two fiscal years, during which the Secretary collected lobbyist registration fees one-third as large as the fees authorized in the Amended Act. *See* Sum. Of Rev. and Exp. of LRF, data available at www.ioc.state.il.us. These surpluses suggest that the Secretary may be unable to show that the three-fold increase in the lobbyist registration fee adequately relates to the costs of administering the Amended Act. And whether the Secretary will eventually be able to do so, he has not done so yet. The fact that the Secretary has so far failed to carry his burden and the reasonable likelihood that he will fall short of carrying his burden at trial establishes that the ACLU has a reasonable likelihood of success. Accordingly, the court finds that the ACLU has sufficiently shown that it has a reasonable likelihood of success on the merits of its challenge to the size of the Levy.

Moreover, on its face the statute appears to privilege religious over non-religious speech. The ACLU is therefore also likely to prevail on its claim that the Amended Act's exemptions for religious organizations and the newsmedia impermissibly discriminate

7

against the ACLU based on the content of its speech. Indeed, by only exempting religious speakers who are "full-time employees of a religious organization" and who speak to the legislature about "protecting the right of the members [of that organization] to practice the religious doctrines of that church or religious organization" the statute also requires another content-based determination focused on religious speech. 25 Ill. Comp. Stat. 170/3(a)(7).

The ACLU's likelihood of success on its establishment clause challenge is equally plain. To pass muster under the establishment clause, the court must find that the Amended Act (1) neither advances nor inhibits religion, (2) has a secular legislative purpose, (3) does not foster an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (internal citations and quotations omitted). On its face the content based determinations discussed above require the state to set the boundaries of a religious organization's exempt advocacy by inquiring into what the doctrines of a church or religious organization are and how the lobbying activities promote them. Requiring such an examination is likely to violate the establishment clause by fostering excessive government entanglement in religion. *Lemon*, 403 U.S. at 613.

**B.      No Adequate Remedy At Law.**

The ACLU contends that every dollar it has to pay in excess of a reasonable registration fee is a dollar it cannot use to speak. The deprivation of the right to communicate – even for brief periods – inflicts irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Nat'l People's Action v. Vill. of Willmette*, 914 F.2d 1008 (7th Cir. 1990). While the Secretary is correct that payment of the Levy under protest

pending the resolution of this suit would make the ACLU *financially* whole, the amount of money involved is not trivial and the deprivation of this amount of money for any period of time would impair the ACLU's core functions and thereby impair its ability to exercise its First Amendment rights.  Repayment post-adjudication cannot restore the ACLU's ability to communicate during the period when the money is withheld. Moreover, neither can repayment restore the disadvantage the ACLU will suffer during the pendency of the litigation, in contrast to speakers exempted from payment of the Levy.

*Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378 (1990) does not counsel otherwise.  *Swaggart* addressed a 6% sales or use tax imposed on tangible personal property challenged in its application to the sale of a religious organization's religious materials.  The Court held that the reduction in income resulting from a hypothetical reduced demand caused by the marginally higher price of the goods in question (which the sales tax would hypothetically create) was constitutionally insignificant.  The Court was careful to distinguish the sales or use tax before it from a levy imposed *as a condition of engaging in protected activity*, 493 U.S. at 694.  Thus, it is important that the amount of the sales tax was small, that it was generally imposed (suggesting no content-based discrimination) *and* it was not a prior restraint.  In this case, in contrast, the Levy, in the context of the finances of a not-for-profit organization, is substantial, it is subject to challenge because at least in its exemptions it is content-based, and, most significantly, it is a prior restraint.

## C.     Irreparable Injury

As stated in section 2.B above, a constitutional violation of the sort the ACLU alleges here causes irreparable harm.  *See Elrod*, 427 U.S. at 373; *Nat'l People's Action v. Vill. of Willmette*, 914 F.2d at 1008.

## D.     Balance Of Harms.

The Secretary argues that the balance of harms weighs against a TRO because the deprivation of revenues from an injunction may prevent the state from complying with the new administrative mandates of the Amended Act.  The court has already found that the ACLU's alleged injury is irreparable and is unpersuaded that a short delay in the payment of revenues caused by the issue of a TRO outweighs this constitutional injury.  At this point, in any case, the Secretary has not shown to what extent the revenues are necessary to comply with the Act; the law requires evidence on this point, not conjecture.

## E.     Public Interest.

While the public presumably has an interest in regulating legislative lobbyists it also has a interest in the vindication of constitutional rights.  *See O'Brien v. Town of Caledonia*, 748 F.2d 403, 408 (7th Cir. 1984).  Accordingly, entering a TRO here serves the public interest.

## CONCLUSION

The ACLU's Motion for a Temporary Restraining Order and Preliminary Injunction is granted.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  December 23, 2009