UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE AMERICAN CIVIL LIBERTIES )
UNION OF ILLINOIS, and )
all similarly situated organizations; and )
MARY DIXON, and all similarly )
situated persons, )
)
                          Plaintiffs, )      Case No. 09 C 7706
     v. )
)      Judge Joan B. Gottschall
JESSE WHITE, Illinois Secretary of State, )
in his official capacity, )
)
                          Defendant. )

## MEMORANDUM OPINION & ORDER

The American Civil Liberties Union of Illinois and Mary Dixon (collectively the "ACLU") filed a class action complaint under 42 U.S.C. § 1983 alleging that the Illinois Lobbyist Registration Act, 25 Ill. Comp. Stat. 170, Public Act 96-555 at § 65 (the "Amended Act") violates the First and Fourteenth Amendments to the United States Constitution by imposing, *inter alia*, a $1,000 levy (the "Levy") on protected speech in excess of the costs to administer the lobbying regulations in the Amended Act, and by exempting religious organizations and the news media from payment of the Levy under certain conditions. After granting the ACLU a temporary restraining order on December 29, 2009 (Doc. No. 35), the court held a preliminary injunction hearing on January 14, 2010. Prior to the hearing, the ACLU moved for consolidation of the preliminary injunction hearing with trial on the merits under Rule 65(a)(2), and for class certification. Finally, in its post-hearing reply brief, the ACLU asks the court to defer resolution of its

claim that the Amended Act's exemptions for media and religious organizations are unconstitutional.

### 1.     <u>Facts</u>

The parties have stipulated that the Secretary estimates that he will spend $1,224,739 to administer the Amended Act in fiscal year ("FY") 2010 and $1,362,359 to do so in FY 2011.  *See* Stipulations of Fact ¶¶ 17, 19 ("Stip. Fact"), Pls.' Ex. 24.  There are 3,947 registered lobbyists or lobbying entities in Illinois as of December 15, 2009. Stip. Fact ¶ 23.  The court adopts these stipulations as its findings of fact.

Multiplying the number of registered lobbyists or lobbying entities by $1,000, the ACLU estimates that the Levy will generate $3,947,000 in FY 2010 and 2011, and generate revenue surpluses of $2,722,261 and $2,584,641, respectively.  See Pls.' Post-Hearing Br. 7.  The Secretary stated that he is unable to estimate projected receipts from the Levy in FY 2010 or 2011 because "he does not know how many individuals or organizations will register as lobbyists in the future or how much revenue will be collected."  Stip. Fact ¶ 14.  The court need not definitively resolve the accuracy of the ACLU's estimates to find that the Levy is unreasonably excessive.

### 2.     **The Tax Injunction Act Does Not Divest This <u>Court Of Jurisdiction Over This Case.</u>**

The Secretary renews his argument, initially made in opposition to the TRO, that the Tax Injunction Act (the "TIA"), 28 U.S.C. § 1341, divests the court of subject matter jurisdiction over this action.  Most of the Secretary's TIA contentions retread case law the court already considered in its memorandum opinion granting the ACLU's request for a temporary restraining order (the "TRO Order") and the court declines to reconsider

those cases and arguments here.  *See* Dec. 23, 2010 Mem. Op. & Order 1-6 (Doc. No.

30).

The court turns, then, to the Secretary's new theory: that the legislature's practice

of "sweeping" excess monies from the Lobbyist Registration Fund ("LRF") to other state

accounts, combined with the mismatch between the revenues the Secretary expects the

Levy to generate and the costs the Secretary expects to incur to enforce the provisions in

the Amended Act, means that the Amended Act established a tax subject to the TIA.  *See*

Def.'s Mem. 2-7.

As the court stated in the TRO Order:

> Whether the TIA divests this court of jurisdiction turns on
> whether the levy is a "tax" or a "fee," a distinction based on
> federal law which the court draws by looking past labels
> and considering where the levied money goes (*i.e.*, to what
> state account) and *why* the money is taken.  Where a levy
> confers a general benefit to the public it is considered a tax;
> a fee, by contrast, provides more narrow benefits to
> regulated companies or defrays an agency's cost of
> regulation.  The classic "regulatory fee" is imposed by an
> agency upon those subject to its regulation.

TRO Order 2 (internal citations and quotation marks omitted).

In support of the Secretary's argument that the Levy is a tax he asks the court to

look backwards to the legislative history of Illinois Public Act 93-32, passed in 2003.  In

that act the Illinois legislature raised three-hundred user fees associated with various state

accounts, including the LRF, to ensure that:

> each fund is paying its 'fair share' for administrative
> services and oversight provided with general funds . . .
> Many funds require a full array of state services, including
> accounting, investing, auditing, leasing and legal
> representation. Many of these services are supported
> through the General Revenue Fund . . . To partially pay for
> prior administrative cost subsidies, $144 million in fund

> balances will be transferred from select funds to the
> General Revenue Fund in fiscal year 2003.

*Ill. State Chamber of Commerce v. Filan*, 837 N.E.2d 922, 925 (Ill. 2005) (quoting

Illinois State Budget FY 2004, 1-10).  From this legislative intent (relating to a bill that is

here unchallenged), and the evidence in the record that the Illinois legislature authorized

sweeps of excess LRF funds (*see* Def.'s Ex. 3) in previous fiscal years (and altered the

State Finance Act to facilitate those sweeps), the Secretary reasons that the increase in the

LRF to $1,000 was intended to generate revenue for general expenditure by the state,

rendering the Levy a tax.

The Secretary's argument is problematic in several respects.  To begin, it is not

obvious to the court how the legislative intent behind an act passed in 2003 relates to the

TIA status of the Amended Act – enacted in 2009 – and the Secretary cites to no

authority that would permit the court to consider intent that is so attenuated.  But even if

the Illinois legislature's intent in passing Public Act 93-32 were relevant to the instant

analysis, it would support finding that the Levy is a fee to which the TIA does not apply.

Indeed, the very language the Secretary quotes to bolster his TIA argument cuts against

his position that Public Law 93-32 instituted a general tax.  *See Filan*, 837 N.E.2d at 925.

Moreover the Secretary himself argues that Public Act 93-32 raised user fees in order to

*eliminate subsidies* that the state was providing to specific funds, like the LRF, that

collected users fees.  Def.'s Mem. 5 (arguing that Public Act 93-32 was "trying to make

up for 'free riding' by some special funds in the past").  Put another way, Public Act 93-

32 increased user fees to better align the cost of state services that charged user fees with

the revenue those charges collected from the individuals or entities who consumed those

services.  In terms of the TIA, then, Public Law 93-32 made user fees in Illinois *more* like

the paradigmatic TIA fee, which imposes an assessment that is used "for the regulation or benefit of the parties on whom the assessment is imposed." *Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 931 (9th Cir. 1996).  To the extent the legislature's past behavior is relevant at all to the instant analysis, then, it shows that (1) the legislature has a track-record of attempting to align user fees with the true cost of the state services that those who pay the fees consume, and (2) in the past, user fees have not covered the full cost of providing such services.  But neither of these points supports a finding that the Levy is a tax subject to the TIA.  To determine whether the Levy is a tax or a fee under the TIA, the court must consider "*why* the money is taken." *Hager v. City of W. Peoria*, 84 F.3d 865, 870-71 (7th Cir. 1996) (emphasis in original).  The history of legislative activity the Secretary cites shows that user fee revenues in the past were taken "for the regulation or benefit of the parties on whom the assessment [was] imposed" and would therefore likely be construed as fees under the TIA. *Bidart*, 73 F.3d at 931.

After providing the court with this historical context, the Secretary applies to the Amended Act three factors the First Circuit relied on in *San Juan Cellular Telephone Co. v. Public Service Commission*, 967 F.2d 683, 685 (1st Cir. 1992), to find that the assessment challenged in *San Juan* was more like a fee than a tax.  As distilled by the Ninth Circuit, the *San Juan* court considered: "(1) the entity that imposes the assessment; (2) the parties upon whom the assessment is imposed; and (3) whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed." *Bidart*, 73 F.3d at 930.  Before examining these factors (and the Secretary's application of them) the court notes that *San Juan* did not hold that these three factors constitute an exhaustive framework for determining whether

5

the TIA applies to a given assessment, *see generally San Juan*, 967 F.2d at 685-86, and neither has the Seventh Circuit.

The first factor, according to the Secretary, strongly favors the "tax" side of the equation because the Illinois legislature imposed the Levy and "an assessment imposed directly by the legislature is more likely to be a tax than an assessment imposed by an administrative agency." *Bidart*, 73 F.3d at 931. The TRO Order, however, addressed this precise point, and the court adheres to that analysis: "The Levy is analogous to the 'classic 'regulatory fee'. . . imposed by an agency upon those subject to its regulation' because, like an agency, the legislature here is regulating those with whom it has interactions concerning the manner of those interactions." TRO Order 3 (citing *San Juan*, 967 F.2d at 685).

As for the second factor, "the parties upon whom the assessment is imposed," the Secretary acknowledges that the Levy applies narrowly, and a typical tax is one that is assessed universally. *See Bidart*, 73 F.3d at 931. Nonetheless the Secretary urges that the Levy is a tax, again relying on the Illinois legislature's decision in 2003 to raise a number of user fees with the passage of Public Act 93-32 in order to "broadly try to increase revenue on many different businesses and persons . . . to make up for what [the legislature] thought was 'free-riding' by some special funds in the past." Def.'s Mem. 5-6. What this six-year old legislative decision has to teach about the "parties on whom [the Amended Act] is imposed," *id*., the court cannot discern, but the argument does not help the Secretary in any case, because the court found above that the history the Secretary relies on undermines his position. *See supra*, pp. 2-4. The second *San Juan* factor, then, counsels that the Levy is a fee.

Finally, the Secretary argues that the third *San Juan* factor, the ultimate use of the assessments, suggests the Levy is a tax.  As he did in opposition to the TRO, the Secretary contends that he wins (under the TIA) by losing (according to the Constitution): the Secretary reasons that the Levy is a tax because the substantial increase in the Levy means that the revenue it generates will greatly outstrip the cost to administer the act, and it is therefore probable that the excess funds will be swept to the GRF where they will be used for other purposes.  The Seventh Circuit has emphasized that *San Juan*'s ultimate use test is not simply a question of where money goes, but also "*why* the money is taken."  *Hager*, 84 F.3d at 871 (emphasis in original).  While the evidence presented at the preliminary injunction hearing and stipulated to by the Secretary plainly establishes that the Levy is excessive – and therefore violates the First Amendment – it does not follow that the legislature intended the fee to be excessive in order to raise general revenues to use for purposes other than the administration of the Amended Act.  In the TRO Order the court definitively found that the legislative history of the Amended Act showed that the legislature intended the Levy to provide revenue for increased regulation of legislative lobbying.  *See* TRO Order 4.  The Secretary has presented no evidence that the legislature passed the Amended Act, which raised the Levy, for any other purpose.  Accordingly, the court finds that the Levy's "ultimate use" is to regulate lobbying activity.

All three of the *San Juan* factors, then, counsel that the Levy is a fee and is therefore not subject to the TIA.  Relying on the reasoning set out above and in the TRO Order, the court concludes for the second time that it has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 1331 and 1343.

3.      **The Secretary Has Failed to Establish the Fit Between**
        <u>**the Levy and the Costs of Regulation Under the Amended Act**</u>.

With its jurisdiction to resolve this dispute settled, the court turns to the constitutionality of the Amended Act.   Any group or person "engaged in trying to persuade . . . [legislative] action is exercising the First Amendment right of petition." *Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir. 1968).   Consequently, legislative lobbying is an activity protected by the First Amendment, *see Brown & Root, Inc. v. La. State AFL-CIO*, 10 F.3d 316, 326 (5th Cir. 1994), and a state may only charge a fee as a precondition for lobbying where that fee is "calculated to defray the expense" of lobbying regulation.  *See Murdock v. Pennsylvania*, 319 U.S 105, 116 (1943).  It is the Secretary's burden affirmatively to "establish the reasonable fit" between the Levy and the costs of administering the Amended Act.  *S. Suburban Housing Ctr. v. Greater S. Suburban Bd. of Realtors*, 935 F.2d 868, 898 (7th Cir. 1991).   The Secretary's post-hearing memoranda present no evidence or argument establishing the requisite reasonable fit, *see* Mem. 19 (conceding that "If the court decides it has jurisdiction . . . based on the evidence at the hearing it appears likely plaintiffs will succeed on the merits."), and the evidence presented at the preliminary injunction hearing shows definitively that the Levy is unreasonable.[1]  *See supra* Section 1.  The court therefore finds that the Amended Act violates the First Amendment of the United States Constitution.

---

[1]      While the court notes that the Secretary has stated on the record that the ACLU's estimates of its future revenue from the Levy are suspect because they assume no fall-off in registrations based on the $1,000 fee, the Secretary has not put forward any evidence to refute those estimates.

### 4.    __Consolidation__

On January 11, 2010 the ACLU moved for consolidation of trial on the merits with the preliminary injunction hearing held on January 14, 2010; the Secretary opposes consolidation and the court will deny consolidation at this time.

### 5.    __Motion for class certification__

The ACLU's Amended Motion for Class Certification (Doc. No. 37) under Rules 23(a), (b)(2) and (g) of the Federal Rules of Civil Procedure is unopposed and seeks to certify two classes.  The first is the "individual lobbyist class," represented by plaintiff Mary Dixon and composed of "all natural persons required to register under the Lobbyist Registration Act," 25 Ill. Comp. Stat. 170/3.  Am. Mot. for Class Cert. ¶ 1.  The ACLU dubs the second class the "entity lobbyist class,"[2] which is represented by plaintiff the American Civil Liberties Union of Illinois, and consists of "all firms, partnerships, committees, associations, corporations, or other organizations or groups of persons required to register under the Lobbyist Registration Act," 25 Ill. Comp. Stat. 170/3.  Am. Mot. for Class Cert. ¶ 2.

To certify the ACLU's proposed classes the court must find that each (1) is sufficiently definite, *see Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir.1977), (2) meets Rule 23(a)'s requirements for numerosity, commonality, typicality and adequacy of representation, and (3) may be maintained under Rule 23(b)(2).  The court must also appoint counsel to represent the class who will do so fairly and adequately.  *See* Rule 23(g)(1)(B).

---

[2]    The court notes that any prior distinction that may have existed between the First Amendment status of for-profit and non-profit entities, and indeed, individual citizens, was abrogated by *Citizens United v. Federal Election Commission*, ___ U.S. ___, No. 08-205, slip op. at 36 (January 21, 2010).

The court certifies the "entity lobbyist" and "individual lobbyist" classes for the reasons set out in the ACLU's Memorandum in Support of Motion for Class Certification (Doc. No. 9) and its Amended Motion for Class Certification (Doc. No. 37). The court appoints the ACLU's attorneys, Harvey Grossman, Edward Feldman, Adam Schwartz, Diane F. Klotnia, Karen Sheley, Roger J. Perlstadt, and Jennifer Saba, to represent the class and finds that they will do so – and, indeed, have already done so – adequately and fairly. Moreover, the court has considered appointed counsel's qualifications in light of Rule 23(g)(1)(C)(i); counsel's prosecution of the case thus far shows that it has met this standard. As the court has certified this class under Rule 23(b)(2), it need not notify class members of the judgment; absent a request from the parties to provide notice, the court will not order the parties to do so. *See* Fed. R. Civ. P. 23(c)(2)(A).

**6.      Stay of Ruling on the Amended Act's
            Religious and Media Exemptions.**

In the interest of judicial economy the ACLU asks the court to stay ruling on the constitutionality of the Amended Act's exemptions for certain media and religious organizations. The ACLU expects that the legislature may seek to revise the Amended Act in light of the court's ruling and that the legislature may also consider the propriety or desirability of the religious and media exemptions at that time. Such legislative change could moot entirely the ACLU's claims regarding the exemptions, and the legal issues those exemptions present are exceedingly complex; resolving them would therefore consume substantial judicial resources. Accordingly, the court declines to reach the ACLU's exemption claims at this time.

7.      **Irreparable Injury, the Balance of Harms and the Public Interest.**

The Secretary has not challenged the court's determination, in its TRO Order, that the constitutional violation alleged and established by plaintiffs causes irreparable harm. The Secretary argues, however, that if an injunction is ordered, it be narrowly drawn to allow the Secretary to collect fees under the old fee schedule.  It has not given the court any suggestion of how or by what authority it might do so.  Absent the revenues provided by the old and new laws, the Secretary argues, its harm will be significant.

The Secretary is in essence asking the court  to reinstate legislation which the legislature has superceded.  It has not advanced any legal basis for doing so.  The propriety of the fee structure under the old Act was not challenged by the plaintiffs, but neither was its legality argued or briefed.

The court will consider narrowing the scope of this injunction pursuant to a proper motion, with an opportunity for both sides to be heard.  But it will not reinstate superceded legislation or rewrite the Amended Act on the basis of a few sentences in a response brief.  The court acknowledges that the harm to the Secretary will be substantial if it can collect no lobbying fees, but the Secretary has a number of options to avoid or minimize this harm.  First, it can request a specific amendment of this order that tells the court exactly what it should do and why the Secretary believes the court has the requisite authority.  Once both sides are heard, and assuming there is a legal basis for such an order, the court may give the Secretary the relief requested.  Second, plaintiffs requested, but the Secretary opposed, consolidation of this preliminary injunction with the trial on the merits; were the court to enter a final order on the merits, it is the court's

understanding that, by operation of Illinois law, the old fee structure would be reinstated. Should the Secretary agree to the requested consolidation, it will get the relief it seeks.

In these ways, the Secretary can avoid a substantial part of the harm of which it complains. Because the plaintiffs' harm is irreparable and there are avenues open to the Secretary to mitigate the harm of which it complains, the court concludes that the balance of harms favors plaintiffs.

The Secretary has not challenged the court's assessment of the public interest factor in the TRO Order. The court reiterates its conclusion that the public interest favors the grant of an injunction.

## CONCLUSION

The ACLU's Amended Motion for Class Certification is granted; its Motion to Consolidate Trial on the Merits with the Preliminary Injunction Hearing is denied. The court finds that the Amended Act violates the First Amendment to the United States Constitution by setting a lobbyist registration fee that is unconstitutionally excessive. Accordingly, the court enjoins the Secretary from requiring members of the entity lobbyist and individual lobbyist classes from paying the $1,000 registration fee established in the Amended Act. The court declines to reach the religious and media exemptions at this time.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 12, 2009